IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | |
| § | 2:11-CR-0026 |
| REED BECKER BRYANT (1), § | |
| DANE TAYLOR CLARK (2) § | |
| CHRISTIAN ALEXANDER WALLSTRUM (3)§ | |

**REPORT AND RECOMMENDATION**
**TO DENY DEFENDANT CLARK'S MOTION TO SUPPRESS EVIDENCE**

Before the Court are Motions to Suppress filed by defendants Reed Becker Bryant, Dane Taylor Clark, and Christian Alexander Wallstrum. The instant Report and Recommendation pertains to the Motion to Suppress filed by defendant Clark on August 23, 2011 (document 78). On September 1, 2011, the Court held a hearing on all three motions. Present at the hearing were all three defendants in the above-numbered cause, their attorneys, and counsel for the government. Based on the pleadings filed in relation to the Motion to Suppress and the evidentiary hearing, the undersigned recommends the Motion to Suppress be DENIED.

I.
FACTUAL BACKGROUND

On February 5, 2011, at approximately 6:00 p.m., Department of Public Safety (DPS) Trooper Brandon Riefers initiated a traffic stop of a silver Ford Fusion. The car was driven by co-defendant Bryant. Defendant Clark was a passenger in the vehicle. Trooper Riefers testified he observed three vehicles traveling in tandem—a SUV, followed by a white Toyota Camry, followed by a silver Ford Fusion. He stated the Camry was following the SUV too closely, and the Fusion

was following the Camry too closely. Trooper Riefers effectuated a traffic stop on the Ford, occupied by defendants Bryant and Clark, while another officer, Trooper Ben Dollar, stopped the Camry, occupied by co-defendant Wallstrum.

The recording of the stop, along with Trooper Riefers's testimony, established that, upon pulling over the Ford, Trooper Riefers approached the vehicle on the passenger side. He informed the driver, co-defendant Bryant, he had been stopped for following too closely behind the Camry and was going to receive a warning for the offense. He asked for Bryant's driver's license and the vehicle's paperwork. Trooper Riefers was informed the car was a rental vehicle, so he collected the car rental agreement before asking Bryant to exit the vehicle and go to the patrol car. At the point Bryant exited the car, Trooper Riefers had detained the vehicle for approximately two minutes and forty seconds.

Once Bryant exited the vehicle, Trooper Riefers turned his attention to defendant Clark, the passenger. Riefers collected Clark's drivers license. The trooper asked Clark general questions about his travel itinerary. Clark told the officer he and Bryant were traveling to Fort Worth to watch the Super Bowl. When the trooper asked Clark if they were going to attend the game itself, Clark vacillated. He initially said he was unsure, then he said they were not attending the game but were attending Super Bowl parties. He eventually said he did not know whether they would watch the game. Clark did not have any specific date on which they planned to return to Arizona (the state in which the car and Bryant were registered). Trooper Riefers asked Clark if he had any relatives in the area, to which Clark responded he did not but believed Bryant had an uncle who lived in Dallas. Trooper Reifers's questioned Clark for approximately two minutes before returning to his patrol car to speak with Bryant.

While Trooper Riefers was verifying all the car, driver, and passenger information, he also asked Bryant general itinerary questions similar to those he had asked Clark. Bryant indicated the two were traveling to North Carolina, coming from New Mexico. He stated they did not plan on traveling anywhere else on their trip. Bryant was unsure whether they were going to fly or drive back to Arizona. Bryant indicated they would be staying with his uncle in North Carolina.

Trooper Reifers testified he became concerned at this point. Taken independently, both stories were questionable. The car rental agreement indicated the car was to stay within Arizona, California, New Mexico, and Texas. Travel to North Carolina was not covered by the rental agreement. Additionally, the rental agreement was for seven days. It did not make sense to Trooper Riefers that Bryant was unsure of when and how he was going to return to Arizona if he had already arranged a rental car for one week. Finally, the rental agreement, which was in the name of Victoria Teague (who Clark represented was his girlfriend), indicated in typed font "no other drivers permitted." In a different area of the rental agreement, however, "Dane Clark additional driver OK" was handwritten. Government Exhibit 2. The rental agreement itself was suspicious in Trooper Riefer's opinion. Further, when taken together, the two stories were totally different. According to Clark, their destination was the Dallas/Fort Worth area. According to Bryant, their destination was North Carolina. Neither man indicated an intent to travel to the other one's stated destination. It was suspicious to Trooper Riefers that the two men had such differing stories regarding the basics of their travel.

Other things were also disconcerting to the officer. The two men were traveling in a car with an out-of-state license plate on Interstate 40, which is a known drug trafficking corridor. When he initially approached the vehicle, Trooper Riefers observed a case of water, a case of Red Bull energy

drink, iced tea and other beverage bottles, and snack foods in the car. This indicated "hard travel" to the officer. When the officer questioned co-defendant Bryant, he appeared to be very nervous. Specifically, Trooper Riefers noticed Bryant's hands and arms were shaking, the carotid artery in his neck was visibly pulsing, indicating a high blood pressure or elevated heart rate, and his eye was involuntarily twitching. It appeared to Trooper Reifers that Bryant was traveling in tandem with the SUV and the Camry, but when he asked Bryant about it Bryant indicated he was not traveling with the other vehicles and then changed the topic. Bryant indicated he was traveling close behind the Camry because he was passing a semi-truck trailer, which Trooper Riefers knew from his own observations was factually incorrect.

After questioning Bryant for approximately five minutes, during which time he was also running routine checks, Trooper Riefers returned to Bryant his driver's license along with all of the papers on the car and a warning for following too close. After returning all of Bryant's documents to Bryant, Bryant began to exit the car. At that point, Trooper Riefers asked Bryant whether he was transporting anything illegal. Bryant indicated he was not. Trooper Riefers requested permission to search the vehicle. Bryant told the officer "I don't care" and "I give you permission, yeah." He additionally indicated that Clark had rented the vehicle and that the officer should also ask Clark if Clark would consent to the search. Trooper Riefers did not ask Clark for consent. Bryant gave his consent for Trooper Riefers to search the car approximately eleven minutes after the stop began.

Trooper Riefers and Bryant then exited the patrol car. The officer approached Clark in the stopped vehicle and had him exit the vehicle to stand in the bar ditch along with Bryant. Trooper Riefers did not ask Clark for permission to search the vehicle nor did he return Clark's driver's license to him. As he was searching the vehicle at the side of the road, Trooper Riefers noticed a

clip on the passenger side of the cowl (where the windshield wiper blades sit) had been tooled, i.e. had tool or screwdriver marks on it. Further, the piece itself appeared to have been lifted up. He additionally found it odd that, despite finding several goods, he did not find any receipts for the goods, which furthered his suspicion the men were traveling with at least one other vehicle. While searching the vehicle, Trooper Riefers discovered a bag in the back seat, which belonged to defendant Clark, and one in the trunk, which belonged to defendant Bryant. In the trunk was Bryant's black "Jeep" bag. Inside that bag were loose grommets and screws. While these grommets and screws would later become key evidence in this case, at that point in time Trooper Riefers did not place any particular significance on the fasteners.

At approximately twenty-five minutes after the initiation of the stop, an Officer Dawson arrived on the scene to assist Trooper Riefers search the vehicle. Officer Dawson had been assisting Trooper Ben Dollar, who had stopped the Camry at around the same time Trooper Riefers stopped the Ford. Officer Dawson reported to Trooper Riefers that the driver of the other vehicle (the Camry) had a story very similar to Clark and Bryant, i.e. that he was going to North Carolina and that he was going to the Super Bowl.

At that point, Trooper Riefers indicated to Bryant that he wanted Bryant to follow him to the DPS office so he could continue the search. Bryant agreed and drove the vehicle to the office, with Officer Dawson in front and Trooper Riefers behind. When the three vehicles arrived at the DPS office, Trooper Dollar had the Camry (the car defendant Bryant was following too closely) on a lift, searching it. As a result of the search of the Camry, the officers discovered approximately twenty pounds of cocaine. They did not discover any narcotics in the Ford. The officers did, however, determine that the compartments in which the drugs were hidden in the Camry were missing a

certain number of grommets and screws. The grommets and screws from Bryant's Jeep bag in the Ford were similar in shape and size and the were the exact same number as those missing from the Camry. At that point, Bryant and Clark were arrested.

## II.
## DEFENDANT'S CONTENTIONS

Defendant Clark contends:

1. The initial detention was unlawful.

2. The lack of reasonable suspicion did not justify the continued detention.

## III.
## DISCUSSION

### *A. The Initial Detention*

The Fourth Amendment to the United States Constitution protects individuals from unreasonable search and seizure. *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003). A traffic stop constitutes a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). To determine whether a seizure, including a traffic stop, was reasonable, a reviewing court must consider (1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

An officer's decision to stop a vehicle for a traffic violation is justified at its inception if he has "objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Banuelos-Romero*, 597 F.3d 763, 766 (5th Cir. 2010) (quoting *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir.

2005)). If there was in fact no violation of state law, there is no justification for the stop. *United States v. Miller*, 146 F.3d 274, 279 (5th Cir. 1998). Such a stop is unconstitutional. *Id.* Thus, "the constitutionality of the officer's stop of [a defendant]'s vehicle must stand or fall based on whether [the defendant] violated Texas law." *Cole*, 444 F.3d at 689.

Section 545.062(a) of the Texas Transportation Code, the statute Trooper Riefers thought defendant Bryant violated, mandates:

> An operator shall, if following another vehicle, maintain an assured clear distance between the two vehicles so that, considering the speed of the vehicles, traffic, and the conditions of the highway, the operator can safely stop without colliding with the preceding vehicle or veering into another vehicle, object, or person on or near the highway.

Tex. Transp. Code Ann. § 545.062 (Vernon 2011).

In this case, defendant Clark contends the stop was void *ab initio* because Bryant simply did not commit the offense of following too close, as defined by Texas law. At the evidentiary hearing, Trooper Riefers testified he approximated there was between sixty and ninety feet between the two vehicles when there needed to be 300 feet of separation between them. When asked to give more specific details of the distance between the cars, Trooper Riefers stated there were two to two and a half highway road stripes separating the two cars. The stripes are thirty feet long, and there is fifteen feet between each stripe. Therefore, Trooper Riefers estimated, there was approximately seventy-five feet of separation between the two vehicles when he observed them.[1] The officer estimated the cars were traveling at a rate of approximately sixty-eight to seventy miles per hour. Trooper Riefers stated the distance between the cars, along with their speed, which he approximated

---

[1] One of defendant's witnesses, an accident reconstructionist, testified he evaluated still shots taken from the patrol car recording and determined the two cars were traveling between sixty and eighty feet apart, which is in line with Trooper Riefer's testimony that he estimated the cars were seventy-five feet apart.

to be sixty-eight miles per hour, was insufficient to allow adequate time for the Ford to safely stop without colliding with the Camry. Trooper Riefers was unable to specify the exact point at which he determined the Ford was following behind the Camry at an unsafe distance. He was, however, able to testify he observed the violation either as the cars were coming up behind him, and as he was looking back, or as they were passing him.

Defendant contends this explanation is inadequate to justify the stop. Defendant fails to indicate what additional observations Trooper Riefers could have made as he was observing the fast-moving vehicles in the moments before he concluded Bryant was following too close. He simply contends Trooper Riefers did not have justification to initiate the traffic stop. Trooper Riefers's testimony, however, establishes he did, in fact, have specific, articulable, objectively reasonable suspicion defendant had violated section 545.062 of the Texas Transportation Code, which prohibits following too close, at the time he initiated the traffic stop. *See Banuelos-Romero*, 597 F.3d at 766. Defendant contends the trooper's determination is undermined because he is unable to recall the exact position of the cars to himself at the point he observed the violation. Defendant presents nothing, however, in support of the contention that a stop is unjustified at its inception if the officer is unable to pinpoint his position in relation to the offending vehicle at the exact time he first observed the offense.

Defendant attempts to confine what Trooper Reifers observed to what the officer's patrol car camera recorded. This is unrealistic and contrary to the officer's testimony. Trooper Riefers testified he saw co-defendant Bryant commit the offense of following too close either when the cars were behind him or as they were passing him. When defendant challenged the trooper's ability to make such a determination based on the angle at which he viewed the cars, the officer remained

steadfast in his testimony. The Court finds no valid reason to reject that testimony.

In any event, the recording from the patrol car picks up the cars as they were moving in front of the patrol car. Even if Trooper Reifers's vision were confined to what his patrol car camera recorded, that recording established co-defendant Bryant, in the Ford, was indeed following the Camry in front of him too closely. At the evidentiary hearing, defense counsel questioned Trooper Riefers on what is commonly referred to the "two second rule," which is that if one car passes a set reference point and a car following that car passes the same reference point at least two seconds after the first car passed that point, then the second car is traveling at a safe distance behind the first car. Defendants apparently prefer this method of determining whether the Ford was traveling a safe distance behind the Camry to Trooper Riefer's determination based upon distance between the two cars and rate of travel. To this end, the defendants presented two witnesses who had reviewed the patrol-car recording, both of whom testified the Ford was traveling at least two seconds behind the Camry. The testimony of those witnesses was contradicted, however, by the time counter accompanying the patrol car recording.

The patrol car recording has a time counter that begins when the recording begins and counts every second of the recording. All parties have referenced and relied upon the times indicated in the recording, and there is nothing before the Court to indicate the counter is inaccurate or unreliable. That counter shows the Camry to pass in front of a fixed reference point at twelve seconds after the recording began. At thirteen seconds after the counter began, the Ford driven by defendant passes that same reference point. The counter unquestionably shows the Camry and the Ford were not separated by two seconds. Therefore, even if the Court were disinclined to believe Trooper Riefer's testimony regarding the distance between and rate of travel of the two cars at the

point he observed the offense and instead preferred to employ the "two second rule," it would still conclude Trooper Riefers observed a violation of section 545.062(a) of the Texas Transportation Code. There was legal justification for the stop. *See Terry*, 392 U.S. at 20, 88 S.Ct. at 1879; *Lopez-Moreno*, 420 F.3d at 430. Defendant's first ground of error is without merit.

### B. The Prolonged Detention

In his second contention, defendant avers Trooper Riefers unreasonably and unlawfully prolonged the search of the car and the detention of Clark. After establishing a police officer's actions were justified at their inception, the next question a court must answer in determining the constitutionality of a traffic stop is whether the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place. *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879. An officer's actions fail to pass this test if the officer detains a vehicle's occupants beyond the time needed to investigate the circumstances that caused the stop. *Brigham*, 382 F.2d at 506. If, however, the officer extends the detention beyond the time required to investigate the circumstances of the stop, that detention "must be based on consent or probable cause." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82, 95 S. Ct. 2574, 2580, 45 L. Ed. 2d 607 (1975).

Fifth Circuit case law has established a police officer may request to examine a driver's license and vehicle registration or rental papers during a traffic stop. *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004). He may run a computer check on those documents. *Id.* "An officer may ask about the purpose and itinerary of a driver's trip during the traffic stop." *Id.* (citing *United States v. Gonzalez*, 328 F.3d 755, 758-59 (5th Cir. 2003)). The Fifth Circuit has "reject[ed] any notion that a police officer's questioning, even on a subject unrelated to the purpose of a routine

traffic stop, is itself a Fourth Amendment violation." *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993). "[N]o Fourth Amendment harm is done where the officer asks the occupants of a vehicle questions that are unrelated to his reason for stopping the vehicle while waiting for routine computer checks to be processed." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010).

In this case, Trooper Riefers's actions were in compliance with the above-cited Fifth Circuit law. The officer properly asked for identification and the car rental agreement. *See Brigham*, 382 F.3d at 507. His questions about the purpose and itinerary of the trip were permissible. *See id.* His questioning occurred in a timely fashion and was done while he was waiting for the routine computer checks to be processed. *See Pack*, 612 F.3d at 350. Immediately after completing the checks and returning co-defendant Bryant's paperwork to him, Trooper Riefers sought and received consent to search the vehicle. None of these actions violated the Fourth Amendment. *See id.* The detention up to the point where Trooper Riefers sought consent to search the vehicle was not unreasonably prolonged.

Even if Trooper Riefers did not have justification for extending the traffic stop, Bryant ultimately consented to the search. Bryant does not contest the validity of his consent, and this Court has determined in the Report and Recommendation issued on Bryant's Motion to Suppress that the consent was valid. Defendant Clark, however, did not consent to the search. Importantly, Clark does not make the argument that the fruits of the search authorized by Bryant should not be used against Clark nor does Clark contest the validity of the Bryant consent. In any event, the Court finds Bryant's consent was all that was necessary to validate the search.

Consent to search may be given not only by the owner of the property to be searched but also by "a third party who possess[es] common authority over or other sufficient relationship to the

premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). In the context of a vehicle search, therefore, a driver's consent to search will validate an officer's search, even if evidence discovered in that search is later used against the non-consenting passenger. *See id.*, 94 S.Ct. at 993; *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *United States v. Varona-Algos*, 819 F.2d 81, abrogated on different grounds *United States v. Jaras*, 86 F.3d 383 (5th Cir. 1996); *United States v. Henao*, 835 F.Supp. 9265, 929-30, (E.D. Tex. 1993). Therefore, Trooper Riefers acted within constitutional bounds in conducting a search based on Clark's consent. *See United States v. Navarro*, 169 F.3d 228, 231 (5th Cir. 1999).

Moreover, the grommets and screws defendant Clark seeks to suppress were found in co-defendant Bryant's luggage. The Court is unsure whether defendant Clark even has standing to request the suppression of the evidence. *See Rakas v. Illinois*, 439 U.S. 128, 138, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978) (reiterating "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by the exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure"). If any Fourth Amendment rights were violated by the search, the exclusion of the evidence (which was discovered only in Bryant's luggage) should be a matter for Bryant to pursue. *See id.*, 99 S.Ct. at 428. In any event, the government has not challenged Clark's standing for his Motion to Suppress.

Based upon Bryant's valid consent alone, both at the road-side traffic stop and again to take the car to the DPS office in Panhandle, a Fourth Amendment violation did not occur in this case. *See Brignoni-Ponce*, 422 U.S. at 881-82, 95 S. Ct. at 2580. Even if Bryant's consent was not valid or should not have applied to defendant Clark, Trooper Riefers nevertheless had reasonable

suspicion upon which to base the continued search. *See Terry*, 392 U.S. at 20, 88 S.Ct. at 1879. Trooper Riefers testified to several factors informing his suspicions defendant was engaging in criminal activity. Among other things, the officer noted (1) Bryant's nervousness; (2) the internally inconsistent and conflicting stories of Bryant and Clark; (3) the fact Bryant and Clark were traveling in a rented car along a drug trafficking corridor; (4) the condition of the car's interior, which indicated "hard travel;" (5) the close proximity between the cars, indicating Bryant and Clark were traveling in tandem with at least one other vehicle, which is common in drug trafficking; (6) Bryant's inaccurate statements about why he was following the Camry too closely; and (7) marked-up screw heads on an area commonly used to hide drugs, i.e. the area between the engine compartment and the passenger compartment, accessed by removing the cowl. Additionally, after Officer Dawson arrived on the scene and confirmed that based upon the comments of the driver of the other car, co-defendant Wallstrum, the two vehicles appeared to be traveling in tandem. The totality of these circumstances justified Trooper Riefers's continuance of the search at the DPS office. *See Pack*, 612 F.3d at 361-62. Therefore, even if the second consent was invalid, the officer had reasonable suspicion to continue the detention. No violation of the Fourth Amendment occurred. *See Terry*, 392 U.S. at 20, 88 S.Ct. at 1879; *Banuelos-Romero*, 597 F.3d at 768 n.1.

In the *Pack* case, the Fifth Circuit evaluated a situation similar to the one presently under review. *See id.* There, the court found that the extreme nervousness of a car's passenger (which was exhibited by heavy breathing, shaking hands, and a visibly pulsing carotid artery), along with the fact the vehicle was traveling along a drug trafficking corridor and the passenger and driver gave conflicting stories regarding their travel itinerary constituted sufficient reasonable suspicion to prolong the detention. *See id.* at 361. The Fifth Circuit established

> When the occupants of a vehicle are nervous and tell such irreconcilable stories to the police, the number of likely explanations for their conduct is limited . . . [A] reasonable officer could fairly conclude that the most likely single alternative explanation, for the nervousness and irreconcilable stories raising reasonable suspicion of some criminal activity, is that the occupants are carrying contraband, particularly when the stop occurs on a highway that is frequently used by smugglers. Therefore, we think that it is reasonable for an officer confronted with such conduct to detain the occupants for a reasonable amount of time to investigate the possibility that they are carrying contraband.

*Id.* at 362.

The totality of the circumstances in this case exceed those present in the *Pack* case. *See id.*; *United States v. Arivizu*, 534 U.S. 266, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (reiterating a reviewing court must base a determination of reasonable suspicion based upon the totality of the circumstances). Trooper Riefers, who had been a member of law enforcement for five years, articulated several strong factors that based upon his training and experience were indicators of criminal activity, as detailed above. The totality of the circumstances presented to Trooper Riefers made him suspect defendant and co-defendant Clark were engaged in drug trafficking. That suspicion was reasonable. *See Pack*, 352 F.3d at 362. Because the prolonged detention was based upon reasonable suspicion, it did not violate the Fourth Amendment. *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879; *Brigham*, 382 F.2d at 506. Defendant's second ground of error is without merit.

IV.
RECOMMENDATION

It is the RECOMMENDATION of the United States Magistrate Judge to the United States District Judge that the Motion to Suppress filed by defendant DANE TAYLOR CLARK be DENIED.

## V.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 9th day of September, 2011.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

### * NOTICE OF RIGHT TO OBJECT *

Any party may object to these proposed findings, conclusions and recommendation. This case is set for docket call on September 19, 2011. Consequently, the time in which to file objections is shortened. In the event a party wishes to object, they are hereby NOTIFIED that the deadline for filing objections is **on or before 4:30 p.m., Wednesday, September 14, 2011**.

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).