IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | 2:11-CR-0026 |
| | § | |
| REED BECKER BRYANT (1), | § | |
| DANE TAYLOR CLARK (2), | § | |
| CHRISTIAN ALEXANDER WALLSTRUM (3) | § | |

**REPORT AND RECOMMENDATION
TO DENY DEFENDANT BRYANT'S MOTION TO SUPPRESS EVIDENCE**

Before the Court are Motions to Suppress filed by defendants Reed Becker Bryant, Dane Taylor Clark, and Christian Alexander Wallstrum. The instant Report and Recommendation pertains to the Motion to Suppress filed by defendant Bryant on August 9, 2011 (document 47). On September 1, 2011, the Court held a hearing on all three motions. Present at the hearing were all three defendants in the above-numbered cause, their attorneys, and counsel for the government. Based on the pleadings filed in relation to the Motion to Suppress and the evidentiary hearing, the undersigned recommends the Motion to Suppress be DENIED.

I.
FACTUAL BACKGROUND

On February 5, 2011, at approximately 6:00 p.m., Department of Public Safety (DPS) Trooper Brandon Riefers initiated a traffic stop of a silver Ford Fusion. The car was driven by defendant Bryant. Co-defendant Clark was a passenger in the vehicle. Trooper Riefers testified he observed three vehicles traveling in tandem—a SUV, followed by a white Toyota Camry, followed by a silver Ford Fusion. He stated the Camry was following the SUV too closely, and the Fusion was following the Camry too

closely. Trooper Riefers effectuated a traffic stop on the Ford, occupied by defendants Bryant and Clark, while another officer, Trooper Ben Dollar, stopped the Camry, occupied by defendant Wallstrum.

The recording of the stop, along with Trooper Riefers's testimony, established that, upon pulling over the Ford, Trooper Riefers approached the vehicle on the passenger side. He informed the driver, defendant Bryant, he had been stopped for following too closely behind the Camry and was going to receive a warning for the offense. He asked for Bryant's driver's license and the vehicle's paperwork. Trooper Riefers was informed the car was a rental vehicle, so he collected the car rental agreement before asking Bryant to exit the vehicle and go to the patrol car. At the point Bryant exited the car, Trooper Riefers had detained the vehicle for approximately two minutes and forty seconds.

Once Bryant exited the vehicle, Trooper Riefers turned his attention to co-defendant Dane Taylor Clark, the passenger. Riefers collected Clark's drivers license. The trooper asked Clark general questions about his travel itinerary. Clark told the officer he and Bryant were traveling to Fort Worth to watch the Super Bowl. When the trooper asked Clark if they were going to attend the game itself, Clark vacillated. He initially said he was unsure, then he said they were not attending the game but were attending Super Bowl parties. He eventually said he did not know whether they would watch the game. Clark did not have any specific date on which they planned to return to Arizona (the state in which the car and Bryant were registered). Trooper Riefers asked Clark if he had any relatives in the area, to which Clark responded he did not but believed Bryant had an uncle who lived in Dallas. Trooper Reifers's questioned Clark for approximately two minutes before returning to his patrol car to speak with Bryant.

While Trooper Riefers was verifying all the car, driver, and passenger information, he also asked Bryant general itinerary questions similar to those he had asked Clark. Bryant indicated the two were traveling to North Carolina, coming from New Mexico. He stated they did not plan on traveling

anywhere else on their trip. Bryant was unsure whether they were going to fly or drive back to Arizona. Bryant indicated they would be staying with his uncle in North Carolina.

Trooper Reifers testified he became concerned at this point. Taken independently, both stories were questionable. The car rental agreement indicated the car was to stay within Arizona, California, New Mexico, and Texas. Travel to North Carolina was not covered by the rental agreement. Additionally, the rental agreement was for seven days. It did not make sense to Trooper Riefers that Bryant was unsure of when and how he was going to return to Arizona if he had already arranged a rental car for one week. Finally, the rental agreement, which was in the name of Victoria Teague (who Clark represented was his girlfriend), indicated in typed font "no other drivers permitted." In a different area of the rental agreement, however, "Dane Clark additional driver OK" was handwritten. Government Exhibit 2. The rental agreement itself was suspicious in Trooper Riefer's opinion. Further, when taken together, the two stories were totally different. According to Clark, their destination was the Dallas/Fort Worth area. According to Bryant, their destination was North Carolina. Neither man indicated an intent to travel to the other one's stated destination. It was suspicious to Trooper Riefers that the two men had such differing stories regarding the basics of their travel.

Other things were also disconcerting to the officer. The two men were traveling in a car with an out-of-state license plate on Interstate 40, which is a known drug trafficking corridor. When he initially approached the vehicle, Trooper Riefers observed a case of water, a case of Red Bull energy drink, iced tea and other beverage bottles, and snack foods in the car. This indicated "hard travel" to the officer. When the officer questioned defendant Bryant, he appeared to be very nervous. Specifically, Trooper Riefers noticed Bryant's hands and arms were shaking, the carotid artery in his neck was visibly pulsing, indicating a high blood pressure or elevated heart rate, and his eye was involuntarily twitching. It appeared to Trooper Reifers that Bryant was traveling in tandem with the SUV and the Camry, but when

he asked Bryant about it Bryant indicated he was not traveling with the other vehicles and then changed the topic. Bryant indicated he was traveling close behind the Camry because he was passing a semi-truck trailer, which Trooper Riefers knew from his own observations was factually incorrect.

After questioning Bryant for approximately five minutes, during which time he was also running routine checks, Trooper Riefers returned to Bryant his driver's license along with all of the papers on the car and a warning for following too close. After returning all of Bryant's documents to Bryant, Bryant began to exit the car. At that point, Trooper Riefers asked Bryant whether he was transporting anything illegal. Bryant indicated he was not. Trooper Riefers requested permission to search the vehicle. Bryant told the officer "I don't care" and "I give you permission, yeah." He additionally indicated that Clark had rented the vehicle and that the officer should also ask Clark if Clark would consent to the search. Trooper Riefers did not ask Clark for consent. Bryant gave his consent for Trooper Riefers to search the car approximately eleven minutes after the stop began.

Trooper Riefers and Bryant then exited the patrol car. The officer approached Clark in the stopped vehicle and had him exit the vehicle to stand in the bar ditch along with Bryant. Trooper Riefers did not ask Clark for permission to search the vehicle nor did he return Clark's driver's license to him. As he was searching the vehicle at the side of the road, Trooper Riefers noticed a clip on the passenger side of the cowl (where the windshield wiper blades sit) had been tooled, i.e. had tool or screwdriver marks on it. Further, the piece itself appeared to have been lifted up. He additionally found it odd that, despite finding several goods, he did not find any receipts for the goods, which furthered his suspicion the men were traveling with at least one other vehicle. While searching the vehicle, Trooper Riefers discovered a bag in the back seat, which belonged to co-defendant Clark, and one in the trunk, which belonged to defendant Bryant. In the trunk was Bryant's black "Jeep" bag. Inside that bag were loose grommets and screws. While these grommets and screws would later become key evidence in this case,

at that point in time Trooper Riefers did not place any particular significance on the fasteners.

At approximately twenty-five minutes after the initiation of the stop, an Officer Dawson arrived on the scene to assist Trooper Riefers search the vehicle. Officer Dawson had been assisting Trooper Ben Dollar, who had stopped the Camry at around the same time Trooper Riefers stopped the Ford. Officer Dawson reported to Trooper Riefers that the driver of the other vehicle (the Camry) had a story very similar to Clark and Bryant, i.e. that he was going to North Carolina to visit his uncle and that he was going to the Super Bowl.

At that point, Trooper Riefers indicated to Bryant that he wanted Bryant to follow him to the DPS office so he could continue the search. Bryant agreed and drove the vehicle to the office, with Officer Dawson in front and Trooper Riefers behind. When the three vehicles arrived at the DPS office, Trooper Dollar had the Camry (the car defendant Bryant was following too closely) on a lift and searching it. As a result of the search of the Camry, the officers discovered approximately twenty pounds of cocaine. They did not discover any narcotics in the Ford. The officers did, however, determine that the compartments in which the drugs were hidden in the Camry were missing a certain number of grommets and screws. The grommets and screws from Bryant's Jeep bag in the Ford were similar in shape and size and the were the exact same number as those missing from the Camry. At that point, Bryant and Clark were arrested.

## II.
## DEFENDANT'S CONTENTIONS

Defendant Bryant contends:

1. Trooper Riefers lacked probable cause to stop Bryant for following too close.

2. Trooper Riefers unreasonably and unlawfully prolonged the search of the car and the detention of Bryant.

## III.
## DISCUSSION

### A. *Justification for the Traffic Stop*

The Fourth Amendment to the United States Constitution protects individuals from unreasonable search and seizure. *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003). A traffic stop constitutes a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). To determine whether a seizure, including a traffic stop, was reasonable, a reviewing court must consider (1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

An officer's decision to stop a vehicle for a traffic violation is justified at its inception if he has "objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Banuelos-Romero*, 597 F.3d 763, 766 (5th Cir. 2010) (quoting *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)). If there was in fact no violation of state law, there is no justification for the stop. *United States v. Miller*, 146 F.3d 274, 279 (5th Cir. 1998). Such a stop is unconstitutional. *Id.* Thus, "the constitutionality of the officer's stop of [a defendant]'s vehicle must stand or fall based on whether [the defendant] violated Texas law." *Cole*, 444 F.3d at 689.

Section 545.062(a) of the Texas Transportation Code, the statute Trooper Riefers thought defendant violated, mandates:

> An operator shall, if following another vehicle, maintain an assured clear distance between the two vehicles so that, considering the speed of the vehicles, traffic, and the conditions of the highway, the operator can safely stop without colliding with the preceding vehicle or veering into another vehicle, object, or person on or near the highway.

Tex. Transp. Code Ann. § 545.062 (Vernon 2011).

In this case, defendant Bryant contends the stop was void *ab initio* because he simply did not commit the offense of following too close, as defined by Texas law. At the evidentiary hearing, Trooper Riefers testified he approximated there was between sixty and ninety feet between the two vehicles when there needed to be 300 feet of separation between them. When asked to give more specific details of the distance between the cars, Trooper Riefers stated there were two to two and a half highway road stripes separating the two cars. The stripes are thirty feet long, and there is fifteen feet between each stripe. Therefore, Trooper Riefers estimated, there was approximately seventy-five feet of separation between the two vehicles when he observed them.[1] The officer estimated the cars were traveling at a rate of approximately sixty-eight to seventy miles per hour. Trooper Riefers stated the distance between the cars, along with their speed, which he approximated to be sixty-eight miles per hour, was insufficient to allow adequate time for the Ford to safely stop without colliding with the Camry. Trooper Riefers was unable to specify the exact point at which he determined the Ford was following behind the Camry at an unsafe distance. He was, however, able to testify he observed the violation either as the cars were coming up behind him, and as he was looking back, or as they were passing him.

Defendant contends this explanation is inadequate to justify the stop. Defendant fails to indicate what additional observations Trooper Riefers could have made as he was observing the fast-moving vehicles in the moments before he concluded Bryant was following too close. He simply contends Trooper Riefers did not have justification to initiate the traffic stop. Trooper Riefers's testimony, however, establishes he did, in fact, have specific, articulable, objectively reasonable suspicion defendant had violated section 545.062 of the Texas Transportation Code, which prohibits following too close, at the time he initiated the traffic stop. *See Banuelos-Romero*, 597 F.3d at 766. Defendant contends the

---

[1] One of defendant's witnesses, an accident reconstructionist, testified he evaluated still shots taken from the patrol car recording and determined the two cars were traveling between sixty and eighty feet apart, which is in line with Trooper Riefer's testimony that he estimated the cars were seventy-five feet apart.

trooper's determination is undermined because he is unable to recall the exact position of the cars to himself at the point he observed the violation. Defendant presents nothing, however, in support of the contention that a stop is unjustified at its inception if the officer is unable to pinpoint his position in relation to the offending vehicle at the exact time he first observed the offense.

Defendant attempts to confine what Trooper Reifers observed to what the officer's patrol car camera recorded. This is unrealistic and contrary to the officer's testimony. Trooper Riefers testified he saw defendant Bryant commit the offense of following too close either when the cars were behind him or as they were passing him. When defendant challenged the trooper's ability to make such a determination based on the angle at which he viewed the cars, the officer remained steadfast in his testimony. The Court finds no valid reason to reject that testimony.

In any event, the recording from the patrol car picks up the cars as they were moving in front of the patrol car. Even if Trooper Reifers's vision were confined to what his patrol car camera recorded, that recording established defendant Bryant, in the Ford, was indeed following the Camry in front of him too closely. At the evidentiary hearing, defense counsel questioned Trooper Riefers on what is commonly referred to the "two second rule," which is that if one car passes a set reference point and a car following that car passes the same reference point at least two seconds after the first car passed that point, then the second car is traveling at a safe distance behind the first car. Defendants apparently prefer this method of determining whether the Ford was traveling a safe distance behind the Camry to Trooper Riefer's determination based upon distance between the two cars and rate of travel. To this end, the defendants presented two witnesses who had reviewed the patrol-car recording, both of whom testified the Ford was traveling at least two seconds behind the Camry. The testimony of those witnesses was contradicted, however, by the time counter accompanying the patrol car recording.

The patrol car recording has a time counter that begins when the recording begins and counts every second of the recording. All parties have referenced and relied upon the times indicated in the recording, and there is nothing before the Court to indicate the counter is inaccurate or unreliable. That counter shows the Camry to pass in front of a fixed reference point at twelve seconds after the recording began. At thirteen seconds after the counter began, the Ford driven by defendant passes that same reference point. The counter unquestionably shows the Camry and the Ford were not separated by two seconds. Therefore, even if the Court were disinclined to believe Trooper Riefer's testimony regarding the distance between and rate of travel of the two cars at the point he observed the offense and instead preferred to employ the "two second rule," it would still conclude Trooper Riefers observed a violation of section 545.062(a) of the Texas Transportation Code. There was legal justification for the stop. *See Terry*, 392 U.S. at 20, 88 S.Ct. at 1879; *Lopez-Moreno*, 420 F.3d at 430. Defendant's first ground of error is without merit.

### B. The Prolonged Detention

In his second contention, defendant avers Trooper Riefers unreasonably and unlawfully prolonged the search of the car and the detention of Bryant. After establishing a police officer's actions were justified at their inception, the next question a court must answer in determining the constitutionality of a traffic stop is whether the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place. *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879. An officer's actions fail to pass this test if the officer detains a vehicle's occupants beyond the time needed to investigate the circumstances that caused the stop. *Brigham*, 382 F.2d at 506. If, however, the officer extends the detention beyond the time required to investigate the circumstances of the stop, that detention "must be based on consent or probable cause." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82, 95 S. Ct. 2574, 2580, 45 L. Ed. 2d 607 (1975).

Fifth Circuit case law has established a police officer may request to examine a driver's license and vehicle registration or rental papers during a traffic stop. *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004). He may run a computer check on those documents. *Id.* "An officer may ask about the purpose and itinerary of a driver's trip during the traffic stop." *Id.* (citing *United States v. Gonzalez*, 328 F.3d 755, 758-59 (5th Cir. 2003)). The Fifth Circuit has "reject[ed] any notion that a police officer's questioning, even on a subject unrelated to the purpose of a routine traffic stop, is itself a Fourth Amendment violation." *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993). "[N]o Fourth Amendment harm is done where the officer asks the occupants of a vehicle questions that are unrelated to his reason for stopping the vehicle while waiting for routine computer checks to be processed." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010).

In this case, Trooper Riefers's actions were in compliance with the above-cited Fifth Circuit law. The officer properly asked for identification and the car rental agreement. *See Brigham*, 382 F.3d at 507. His questions about the purpose and itinerary of the trip were permissible. *See id.* His questioning occurred in a timely fashion and was done while he was waiting for the routine computer checks to be processed. *See Pack*, 612 F.3d at 350. Immediately after completing the checks and returning defendant Bryant's paperwork to him, Trooper Riefers sought and received consent to search the vehicle. None of these actions violated the Fourth Amendment. *See id.* The detention up to the point where Trooper Riefers sought consent to search the vehicle was not unreasonably prolonged.

Even if Trooper Riefers did not have reasonable suspicion to justify extending the stop after issuing the warning tickets, Bryant consented to the search. Bryant does not contest the validity of his consent. Further, the Court has reviewed the validity of the consent. To determine whether consent was validly given, the reviewing court must determine (1) whether consent was voluntary and (2) whether

it was an independent act of free will. *United States v. Jenson*, 462 F.3d 399, 406 (5th Cir. 2006) (citing *Chavez-Villarreal*, 3 F.3d at 127).

Consent is voluntary if it passes the muster of a six-factor test: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993).

Consent in this case was voluntarily given. At the time Trooper Riefers sought consent to search the vehicle, he had returned to defendant all of defendant's documents along with a warning for following too close. The officer had detained defendant for approximately eleven minutes, during which time he was speaking with the car's passenger and running routine computer checks. Trooper Riefers did not act in a coercive fashion. To the contrary, the officer was very polite and professional throughout the duration of his encounter with defendant. Likewise, defendant was very cooperative with Trooper Riefers, engaging in friendly conversation with the officer. From the recording of the encounter, defendant Bryant seemed to understand and be able and willing to communicate with Trooper Riefers. There is no evidence before the Court regarding the defendant's awareness of his right to refuse to consent, and Trooper Riefers testified he did not inform defendant of that right. The Court observes, however, that during the search defendant Bryant commented that if he would have known how long the search would take, he would not have consented. Clearly, Bryant had some idea of his right to refuse consent or limit the search. There is also no evidence before the Court regarding defendant's education and intelligence or defendant's belief that no incriminating evidence would be found. Since there was no independently incriminating evidence located in the car, however, it is assumed defendant Bryant did

not believe incriminating evidence would be found. The totality of these factors lead the Court to conclude Bryant's consent to search was voluntary. *See Kelley*, 981 F.2d at 1470.

Additionally, the consent was an independent act of free will. *See Jenson*, 462 F.3d at 406. In determining whether the consent was an independent act of free will, a reviewing court considers "1) the temporal proximity of the illegal conduct and the consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the initial misconduct." *United States v. Jones*, 234 F.3d 234, 243 (5th Cir. 2000). To be clear, the Court concludes Trooper Riefers did not engage in any misconduct. It engages in this analysis only out of an abundance of caution.

Bryant gave Trooper Riefers consent to search the vehicle after Trooper Riefers had concluded matters relating to the original traffic offense. While Bryant consented to the search within one minute of Trooper Reifers concluding the traffic stop, the return of Bryant's driver's licence along with the car's registration papers and the warning clearly signaled the conclusion of the stop and acted as an intervening circumstance. *See Jenson*, 462 F.3d at 407. Finally, there was no evidence indicating any purposeful and flagrant misconduct of Trooper Riefers in detaining Bryant. Therefore, the consent was an independent act of free will. *See id.* at 406. Because the extension of the detention was based on defendant's valid consent, no Fourth Amendment violation occurred. *See Brignoni-Ponce*, 422 U.S. at 881-82, 95 S. Ct. at 2580.

Defendant finally argues that after Trooper Riefers had searched the vehicle and had discovered no illegal contraband the search should have ended. Defendant is correct that Trooper Riefers searched the vehicle at the side of the road for approximately thirty-seven minutes without finding any contraband. After searching the vehicle at road-side, Trooper Riefers indicated to Bryant that he would like to continue the search at the DPS office. He asked Bryant to follow him back to the office. Bryant

agreed. At that point, Trooper Riefers had Bryant once again turn over his driver's license. They then proceeded to the DPS office.

Again, defendant Bryant does not contest the validity of his consent to allow the officer to continue the search of the car at the DPS office. *See Brignoni-Ponce*, 422 U.S. at 881-82, 95 S. Ct. at 2580. In any event, the consent was voluntary. *See Jenson*, 462 F.3d at 406. At the time Trooper Riefers asked for permission to continue the search, defendant Bryant had all of documents necessary for legal travel in his possession. While Trooper Riefers told defendant he was unsure of how long the search would take and may have stated, in response to defendant's complaint about how long the search was taking, that "this is how we do it in Texas," the officer was not acting in a coercive fashion. Defendant had begun to express frustration with the length of the search, but he remained cooperative with the officer. He felt free to express his discontent with the officer's performance. For these reasons and the analysis previously set forth, the Court concludes Bryant's consent to the continued search was voluntary. *See Kelley*, 981 F.2d at 1470.

The second consent was also an independent act of free will. *See Jenson*, 462 F.3d at 406. Trooper Riefers had been searching the vehicle for several minutes when he sought consent from defendant for the search to continue at the DPS office. Bryant had in his possession his driver's license and the car registration papers and had been watching Trooper Riefers search the vehicle for several minutes. Trooper Riefers had been searching the vehicle almost the entire time. There was no evidence indicating the officer engaged in any misconduct. Thus, the chain between any Fourth Amendment violation and the consent to continue the search was clearly broken. *See Jones*, 234 F.3d at 243.

Even if defendant's consent to the continued search at the DPS office was not valid, the officer nevertheless had reasonable suspicion upon which to base the continued search. *See Terry*, 392 U.S. at

20, 88 S.Ct. at 1879. Trooper Riefers testified to several factors informing his suspicions defendant was engaging in criminal activity. Among other things, the officer noted (1) Bryant's nervousness; (2) the internally inconsistent and conflicting stories of Bryant and Clark; (3) the fact Bryant and Clark were traveling in a rented car along a drug trafficking corridor; (4) the condition of the car's interior, which indicated "hard travel;" (5) the close proximity between the cars, indicating Bryant and Clark were traveling in tandem with at least one other vehicle, which is common in drug trafficking; (6) Bryant's inaccurate statements about why he was following the Camry too closely; and (7) marked-up screw heads on an area commonly used to hide drugs, i.e. the area between the engine compartment and the passenger compartment, accessed by removing the cowl. Additionally, after Officer Dawson arrived on the scene and confirmed that based upon the comments of the driver of the other car, co-defendant Wallstrum, the two vehicles appeared to be traveling in tandem. The totality of these circumstances justified Trooper Riefers's continuance of the search at the DPS office. *See Pack*, 612 F.3d at 361-62. Therefore, even if the second consent was invalid, the officer had reasonable suspicion to continue the detention. No violation of the Fourth Amendment occurred. *See Terry*, 392 U.S. at 20, 88 S.Ct. at 1879; *Banuelos-Romero*, 597 F.3d at 768 n.1. Defendant's second ground of error is without merit.

IV.
RECOMMENDATION

It is the RECOMMENDATION of the United States Magistrate Judge to the United States District Judge that the Motion to Suppress filed by defendant REED BECKER BRYANT be DENIED.

V.
INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and Recommendation

to each party by the most efficient means available.

      IT IS SO RECOMMENDED.

      ENTERED this 9th day of September, 2011.

                                                  CLINTON E. AVERITTE
                                                UNITED STATES MAGISTRATE JUDGE

## * NOTICE OF RIGHT TO OBJECT *

      Any party may object to these proposed findings, conclusions and recommendation. This case is set for docket call on September 19, 2011. Consequently, the time in which to file objections is shortened. In the event a party wishes to object, they are hereby NOTIFIED that the deadline for filing objections is **on or before 4:30 p.m., Wednesday, September 14, 2011**.

      Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).